**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Tollie Carter, | ) | |
| | ) | No. 10 C 321 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| Chicago State University, | ) | |
| Bijesh Tolia, and Farhad Simyar, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## Introduction

Tollie Carter brings this suit against his employer, Chicago State University ("CSU"), and two former supervisors, Farhad Simyar and Bijesh Tolia, alleging various acts of unlawful discrimination and retaliation from 2008 through 2011. Carter asserts claims under (i) the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 101 *et seq.*, (ii) 42 U.S.C. § 1981 ("Section 1981"), (iii) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and (iv) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Presently before the Court is Defendants' motion for summary judgment. R. 88. For the following reasons, Defendants' motion is granted in part and denied in part.

Carter takes a scattershot approach in this case, similar to a prior case he filed against these same defendants involving various conduct from 2006 through 2007. He essentially alleges that every employment action he does not like is the

1

result of some form of unlawful discrimination and retaliation. Most of these claims ultimately fail, but worse, they make finding potentially meritorious claims in the thicket more difficult. There is one set of claims where Carter has at least demonstrated that a genuine issue of material fact exists for trial—retaliation claims under the FMLA, Section 1981, Title VII, and the ADA involving the April-May 2008 appointment process for department chair.

## Background[1]

Carter is an Associate Professor of Accounting at CSU. DSOF ¶ 1. He began teaching at CSU in 1986 and received tenure in 1992. Carter Dep. at 37; PSOF ¶ 7. Carter is a Certified Public Accountant ("CPA") and has an undergraduate degree in accounting and an MBA in accounting and finance, both from the University of Illinois at Chicago. Carter Dep. at 7-8. He does not have a Ph.D. *Id.* at 7.

CSU's College of Business is made up of two departments: (i) Accounting and Finance, the department primarily at issue here (the "Department"); and (ii) Management, Marketing, and Information Systems (the "MMIS Department"). PSOF ¶ 15. Defendant Simyar was the Dean of the College of Business from mid-2005 through January 19, 2010. DSOF ¶ 5. Defendant Tolia was the Chair of the Department from 2006 through September 2007 and served as acting Chair until November 1, 2007. DSOF ¶ 3; PR ¶ 3. From September 2007 until June 30, 2010, Tolia was the Associate Dean for the College of Business. DSOF ¶ 3.

---

[1] The Court cites to Defendants' Statement of Material Facts as "DSMF ¶ __," Plaintiff's Response as "PR ¶ __," Plaintiff's Statement of Additional Material Facts as "PSMF ¶ __," and Defendants' Response as "DR ¶ __."

At all relevant times, the Department had nine professors: four African-American males (including Carter), three African-American females, one Asian male, and one Hispanic male. DSOF ¶ 9.

**Spring 2008 FMLA Leave**

In the spring semester of 2008, Carter was teaching four courses. DSOF ¶ 38. On January 22, 2008, a week or two into the semester, Carter requested FMLA leave to care for his ailing mother. DSOF ¶ 33; PR ¶ 33. CSU granted the request and Carter took more than seven weeks of FMLA leave, from January 29 through March 20, 2008. DSOF ¶ 33; PR ¶ 33. In Carter's absence, CSU hired a part-time professor to cover at least one of his courses and used other professors in the Department to cover his remaining courses. DSOF ¶ 38; PR ¶ 38.

When Carter returned on March 21, 2008, six or seven weeks remained in the semester.[2] At that point, CSU decided to let Carter's replacements finish out the semester, stating that it would be in the students' best interests to avoid further disruption. DSOF ¶ 40. As a temporary assignment for the rest of the semester, CSU asked Carter to prepare and improve master course outlines. *Id.* ¶ 41. After Carter objected, CSU reduced the number of outlines that Carter would need to prepare from thirteen to four. *Id.* ¶ 45. Notably, those were the four courses that

---

[2] The parties make various claims about how much time remained in the semester at that point, anywhere from four to eight weeks. *E.g.,* DSOF ¶ 39; PR ¶ 39. Carter's record citations support that six or seven weeks remained. Simyar testified that the semester ended around May 5 or May 10, which is six to seven weeks after March 21. In their reply, Defendants represent that the last day of classes was May 6, R. 110 at 2 n.2, which means that six weeks and three days remained.

Carter had been teaching that semester, Carter Dep. at 85 & Ex. 10, and would teach in the future. Jefferson Dep. Ex. 4 at 1111. At the time, Carter thanked CSU administrators "for their support in revising th[e] assignment to make it a reasonable one." DSOF ¶ 46. In his deposition in this case, Carter again conceded that the outline assignment he completed "was reasonable" "[u]nder the circumstances." Carter Dep. at 111. While working on the course outlines, Carter's title, seniority, and base salary did not change. DSOF ¶ 41; PR ¶ 41.

From 1983 through 1997, CSU allowed employees to accrue payable sick days (CSU changed its policy in 1998). DSOF ¶¶ 24-25. Prior to his FMLA leave, Carter had 107.5 payable sick days that accrued under CSU's old policy. *Id.* ¶ 26; Carter Dep. Ex. 14 at 1130-31.[3] In September 2008, six months after his return from FMLA leave, Carter received a payroll record showing that his payable sick day balance was zero. PR ¶¶ 26, 36-37; Carter Dep. Ex. 14 at 1132. The exact circumstances behind this particular record are unclear, but there is no genuine dispute that the record was an error and that Carter still had 107.5 payable sick days after he returned from FMLA leave. DSOF ¶¶ 36-37; Mays Aff. ¶¶ 9-12.

**2008 Chairperson Appointments**

The Chair of the Department is appointed through a multi-step process. DSOF ¶ 19. First, the Department's faculty holds a vote to recommend a candidate. *Id.* ¶ 20. Next, the Dean of the College of Business reviews the faculty vote and

---

[3] Carter apparently "contends that he should have accrued *170.5* compensable sick days," PR ¶¶ 26, 35 (emphasis added), but Carter never explains that contention or how it has anything to do with his FMLA leave.

decides, based on the needs and best interests of the Department, if he feels that the professor chosen by the faculty vote should become Chair. *Id.* Finally, the Dean forwards the results of the faculty vote along with his own recommendation to the Provost. *Id.* ¶ 21. There, the Provost reviews the information and meets with CSU's President to discuss the appointment. *Id.* CSU's President ultimately has the final say over who will be appointed chair of each department, but usually defers to the Dean's recommendation. *Id.*; PSOF ¶ 22; DR ¶ 22.

In April 2008, the Department began the process to appoint a Chair. Earlier, Tolia had stepped down as Chair after becoming the Associate Dean for the College of Business. Barbara Roper was serving as acting Chair. DSOF ¶ 47.

Carter and Ernest Coupet (African-American male), another professor in the Department, put their names into the selection process. *Id.* ¶ 48. In the faculty vote, Carter and Coupet tied with four votes each. *Id.* After the vote, Coupet voluntarily withdrew from consideration in order to promote unity within the Department. *Id.* ¶ 49. Coupet's withdrawal left Carter as the only candidate.

Simyar was not willing to support Carter, however, and tried to persuade Coupet to reconsider. PSOF ¶ 19. Simyar told Coupet that Carter was not an option and that he would look outside the Department to fill the position if Coupet would not take it. *Id.* Somewhat reluctantly, Coupet agreed to re-enter the race, *id.*, and Simyar recommended Coupet to CSU's President, Elnora Daniels. Although the Provost had some reservations about Coupet's commitment based on past refusals to accept administrative jobs, *id.* ¶ 25, Daniels followed Simyar's recommendation

and selected Coupet as Chair in May 2008. The Provost's concerns were apparently prophetic. Coupet resigned as Chair after about two months. *Id.* ¶ 28.

To explain his lack of support for Carter's candidacy, Simyar cited a policy—either of CSU itself or Daniels—requiring that department chairs have Ph.D.'s. Jefferson Dep. Ex. 7 at 1207-08; Simyar Dep. at 29-32. Nonetheless, around the same time, Simyar recommended and Daniels appointed Zafar Bokhari Chair of the MMIS Department—the other half of the College of Business—even though his Ph.D. was from an unaccredited institution and was not officially recognized by CSU. PSOF ¶ 26; DR ¶ 26. Coupet's predecessor and successor as Chairs of the Department—Roper and Atha Hunt—also did not have Ph.D.'s, although each served only as temporary, acting Chairs. PSOF ¶¶ 18, 30; DR ¶ 28. In 2008, a few other department chairs also did not have Ph.D.'s, including in the Art and Design, Occupational Therapy, and Music Departments. DSOF ¶ 53.

In November 2008, CSU appointed Hunt as acting Chair to fill the vacancy left by Coupet. PSOF ¶ 28; DR ¶ 28. There is no evidence in the record indicating that Carter expressed any interest in the acting Chair position at that time.

**Summer Course Assignments**

CSU offers its faculty the opportunity to teach summer courses for additional pay. DSOF ¶ 10. Courses are generally split between two six-week sessions. *Id.* Each department chair is responsible for matching up professors with available courses, subject to review by the dean of the college and a university-wide summer school committee. *Id.* ¶ 16; PR ¶ 16. A professor must submit a request in order to

be eligible for assignments, although if no one timely applies to teach a particular course, CSU would assign it to a professor who applied after the deadline or not at all. DSOF ¶12; PR ¶ 12; Tolia Dep. at 52. Professors are not guaranteed courses— availability is contingent on budget, program need, student interest, and the department's rotation list. DSOF ¶ 11. The rotation list changes from year to year based on prior assignments, with some preference given to professors within four years of retirement. *Id.* ¶¶ 13-14. Carter was not within four years of retirement during the summers of 2008-11. Carter Dep. Ex. 2 (noting Carter's plan to retire on or before December 31, 2015 and confirming that he would be eligible for preferential consideration beginning in the summer of 2012).

**Summer 2008**

On September 14, 2007, Carter timely requested to teach Accounting 110 (Intro to Financial Accounting) and Accounting 111 (Intro to Managerial Accounting) in the summer of 2008. DSOF ¶ 27. Although Carter preferred to teach both classes during the first summer session, *id.*, Accounting 110 and 111 are sequential courses. The Department therefore prefers to offer Accounting 110 in the first session and Accounting 111 in the second session to allow students to take both courses in order. *Id.* ¶ 28. On January 23, 2008, Roper notified Carter that he was assigned to teach Accounting 111 in the second session. DSOF ¶ 30.

CSU assigned summer courses to eight professors in the Department. DSOF ¶ 31; PR ¶ 31. Five professors, including Carter, received one course. Three professors received two courses: Janet Grange (African-American female); Hunt

(African-American male); and Chang Choi (Asian male). DSOF ¶¶ 31-32; PR ¶¶ 31-32.[4] Grange received the Accounting 110 course that Carter requested; her second course was an independent study program. DSOF ¶ 31.

**Summer 2009**

The university-wide deadline for submitting course requests for the summer of 2009 was September 15, 2008. DSOF ¶ 15; Carter Dep. Ex. 4 at 9. Carter was second on the Department's rotation list that year and should have received a favorable assignment, Simyar Dep. at 80-81, but he did not submit his request until September 22, 2008, one week after the deadline. DSOF ¶ 57. CSU did not assign Carter any courses. *Id.* ¶ 59. Another professor in the Department, Linnae Bryant (African-American female), submitted her request two days after the deadline. *Id.* ¶ 60. CSU did not assign her any courses either. *Id.*

CSU assigned summer courses to five professors in the Department. DSOF ¶ 61. Three professors received two courses: Roper (African-American female); Hunt (African-American male); and Choi (Asian male). *Id.* Two professors received one course: Grange (African-American male) and Vincent Osaghae (African-American male). *Id.* The courses that Carter requested—Accounting 110 and 111, Carter Dep. Ex. 6—were assigned to Roper/Grange (CSU offered two sections of Accounting 110 that summer) and Osaghae, respectively. DSOF ¶ 61.

---

[4] Carter notes that various professors in the MMIS Department routinely received two summer courses. However, assignments are dictated by supply and demand within each department—recommendations are made by the department chair based on that department's course offerings and faculty rotation list. As a result, assignments in other departments are not material to Carter's claims.

**Summer 2010**

Carter timely submitted a course request for the summer of 2010 and was initially assigned two courses. DSOF ¶ 62. Shortly before the summer, CSU reassigned one of Carter's courses to Roper (African-American female) who erroneously did not have any courses assigned to her. *Id.* ¶ 63. That decision was made by acting Chair Hunt (African-American male) and Dean Derrick Collins (African-American male). *Id.* ¶ 64. In the end, CSU assigned summer courses to seven professors in the Department. *Id.* ¶ 65. Five professors, including Carter, received one course. *Id.* Two professors received two courses: Hunt (African-American male) and Choi (Asian male). *Id.* ¶¶ 65-66.

**Summer 2011**

Carter timely requested to teach Accounting 110 and 111 in the summer of 2011. DSOF ¶ 67; Carter Dep. Ex. 18. He was assigned one course, Accounting 111. DSOF ¶¶ 67-68. CSU assigned courses to eight professors in the Department. *Id.* ¶ 68. Four professors, including Carter, received one course. *Id.* Four professors received two courses: Roper (African-American female); Hunt (African-American male); Choi (Asian male); and Richard Arrendondo (Hispanic male). *Id.* ¶¶ 68-69; PR ¶¶ 68-69. Grange received the Accounting 110 course that Carter requested; that was her only course assignment that summer. DSOF ¶ 68.[5]

---

[5] Hunt (African-American male) and Choi (Asian male) were the primary beneficiaries of two course assignments. They each taught two courses every summer from 2008 through 2011. Hunt always taught Legal Environment and Federal Income Tax, DSOF ¶¶ 31, 61, 65, 68, courses that Carter has never taught and is not qualified to teach. Jefferson Aff. ¶ 10. Choi always taught Personal

**Prior Lawsuit and EEOC Charges**

This is not Carter's first lawsuit. In 2007, Carter sued CSU, Simyar, and Tolia under the ADA, Title VII, and Section 1981. *Carter v. Chicago St. Univ.*, No. 07 C 4930 (N.D. Ill.) (Zagel, J.) ("*Carter I*").[6] In that suit, Carter challenged the course assignments he received for the summers of 2006 and 2007 and the 2006-07 school year. The court ultimately entered summary judgment against Carter on almost all of his claims. *Carter I*, 2011 WL 3796886 (N.D. Ill. Aug. 24, 2011). The court rejected Carter's ADA claims, holding that his sleep apnea was not a qualified disability and that CSU reasonably accommodated his needs in any event. *Id.* at *5-6. The court rejected his Title VII and Section 1981 claims alleging gender and race discrimination. *Id.* at *7-9. The court also rejected the majority of his Title VII and Section 1981 retaliation claims. *Id.* at *9-11.

The court, however, found that a fact issue existed as to whether CSU unlawfully retaliated against Carter for filing an EEOC complaint in January 2007 when it sanctioned him in June 2007 for failing to teach an assigned class. *Id.* at *11. The court found that Carter submitted sufficient circumstantial evidence of animus to support his claim, including: (i) in April 2007, a CSU administrator wrote in a memorandum that Carter should be prohibited from teaching in the summer in order to allow him to concentrate on reducing and controlling his claimed medical

---

Financial Decisions and Principles of Finance, DSOF ¶¶ 31, 61, 65, 68, again classes that Carter has never taught and is not qualified to teach. Jefferson Aff. ¶ 10. *See also* DSOF ¶ 66; PR ¶ 66.

[6] Carter's original complaint, filed in August 2007, did not name Tolia and Simyar as defendants. They were added as defendants in an amended complaint filed on November 20, 2007.

conditions; and (ii) another professor testified that Simyar had told him sometime in 2006 or 2007 that Carter would soon be fired. *Id.* at *10-11. The court entered its summary judgment ruling in August 2011, and the parties eventually settled Carter's surviving claim in June 2012 shortly before trial.

Carter also engaged in other protected activity that he alleges led to retaliation from 2008 through 2011. On August 26, 2009, August 12, 2010, and July 29, 2011, Carter filed charges of discrimination with the EEOC concerning the various allegations that are at issue in this case. DSOF ¶¶ 72-74.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Analysis**

## I. Family Medical Leave Act

### A. Interference

The FMLA entitles an eligible employee to 12 weeks of unpaid leave during a 12-month period in order to care for a spouse, child, or parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The FMLA further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Id.* § 2615(a)(1). To prevail on a claim for FMLA interference, a plaintiff is required to prove that: (1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take FMLA leave; and (5) his employer denied him benefits to which he was entitled. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011).

Carter alleges that CSU interfered with his FMLA rights in three ways, all of which occurred after he returned from FMLA leave in March 2008. In each case, the only issue is the fifth element of an interference claim—whether CSU denied Carter rights to which he was entitled. There is no genuine dispute that Carter can establish the first four elements of an interference claim.

#### 1. Master Course Outlines

Carter alleges that CSU improperly required him to prepare master course outlines when he returned from leave and that he should have been allowed to resume teaching for the six or seven weeks remaining in the semester.

Under the FMLA, an employee returning from leave is entitled to be restored to his original position or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A)-(B). An "equivalent position":

> is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a); *see also Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 748 (7th Cir. 2004). The equivalency requirement "does not extend to *de minimus*, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

CSU essentially asks the Court to recognize an exception to Carter's right to restoration for "a *temporary* reassignment . . . based on CSU's needs (the desire to provide continuity in the classroom, particularly toward the end of the semester)." R. 110 at 2 (emphasis in original). CSU does not cite any legal authority that supports such an exception. The only authority it cites is *Crawford v. JPMorgan Chase & Co.*, 2012 WL 1185983 (S.D. Ohio Apr. 9, 2012), but *Crawford* is not on point. *Crawford* did not involve a temporary reassignment before an employee was returned to her original position. In *Crawford*, the plaintiff returned from FMLA leave to the same position she always held. *Id.* at *4-5. A few weeks later, the plaintiff's employer eliminated her original position and transferred her to a new position. *Id.* at *5. The court ultimately held that the positions were equivalent, and that as a result, the transfer did not violate the FMLA. *Id.*

The Court notes that FMLA regulations do allow employers to temporarily reassign employees to alternative positions, but those regulations apply only to employees on intermittent or reduced-schedule FMLA leave. 29 C.F.R. § 825.204. In those circumstances, "[i]f a temporary reassignment is made. . . , the FMLA requires that the employee be reinstated to [his] previous position (or one comparable in duties and compensation) once [his] leave has been exhausted and [he] returns to full-time work." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 n.8 (7th Cir. 2008); *see also* 29 C.F.R. § 825.204(e). This seems to suggest that an employee returning to full-time employment is entitled to immediate restoration to the same or equivalent position. The Sixth Circuit held as much in *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246-49 (6th Cir. 2004), rejecting an employer's argument that it could delay an employee's restoration "for a 'reasonable time' after returning from FMLA leave." *See also Vlahos v. Schroeffel*, 2006 WL 544444, at *5 n.7 (S.D.N.Y. Mar. 6, 2006) ("Pointing out that the . . . position was supposed to be temporary does not help defendants. The FMLA does not allow the employer reasonable time to return an eligible employee to an equivalent position.").

CSU therefore is not entitled to summary judgment simply because the master course outlines were a temporary reassignment designed to avoid the disruption caused by changing professors mid-semester. But that does not end the inquiry. The ultimate question is whether CSU restored Carter to the same or equivalent position upon his return from FMLA leave. The Court finds that CSU did just that, and that no reasonable jury could find otherwise.

After his return from FMLA leave, Carter remained an Associate Professor. His seniority and salary were unaffected. He taught a course in the summer of 2008 and then during the 2008-09 school year and beyond. And most important to the key issue here, Carter's reassignment for the remainder of the spring semester of 2008 did not involve any duties or responsibilities beyond the scope of the position Carter held before he went on FMLA leave. There is no doubt that preparation is part of teaching. Carter simply had to prepare four outlines for the exact courses he had been teaching that semester and would teach in the future. Carter Dep. at 85 & Ex. 10; Jefferson Dep. Ex. 4 at 1111. Carter twice conceded that the outline assignment was reasonable, first when he handed in the outlines, and again in his deposition in this case. DSOF ¶ 46; Carter Dep. at 111. The Court therefore finds that CSU properly restored Carter to the same or equivalent position.

## 2.    Credit Equivalency Units

Carter also alleges that CSU interfered with his FMLA rights because he received fewer "credit equivalency units" ("CUEs") from the outline assignment as opposed to teaching courses, and that as a result, he lost the opportunity to earn a bonus that he might have earned if he had been allowed to teach.

Under the FMLA, "[p]ay increases conditioned upon . . . work performed must be granted in accordance with the employee's policy or practice with respect to other employees on an equivalent leave status for a reason that does not qualify as FMLA leave." 29 C.F.R. § 825.215(c)(1). Moreover, "if a bonus or other payment is based on the achievement of a specified goal such as hours worked . . ., and the employee has

not met the goal due to FMLA leave, then the payment may be denied, unless otherwise paid to employees on an equivalent leave status for a reason that does not qualify as FMLA leave." *Id.* § 825.215(c)(2).

To establish that CSU violated the FMLA, Carter would therefore have to show that CSU deviated from its policy or practice for other employees on non-FMLA leave. Carter makes no attempt to do so. Indeed, when Roper missed thirteen days on non-FMLA leave and two of her classes were reassigned to other professors, she received a reduction of CUEs as well. PSOF ¶ 14; Tolia Dep. Ex. 1. Absent some evidence of a deviation from policy or practice for employees on non-FMLA leave, Carter's FMLA interference claim for reduced CUEs fails.

### 3. Payable Sick Days

Carter also alleges that CSU interfered with his FMLA rights when it sent him a payroll record in September 2008 that appeared to indicate that his payable sick day balance was zero. Prior to going on FMLA leave, Carter had accrued 107.5 payable sick days under a CSU policy in effect from 1983 through 1997.

The FMLA provides that leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." 29 U.S.C. § 2614(a)(2). As with any claim for FMLA interference, Carter is only entitled to relief if he was prejudiced by the alleged violation. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) ("[A]n employee must prove, as a threshold matter, that the employer violated [29 U.S.C.] § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, § 2617 provides no relief unless the

employee has been prejudiced by the violation."); *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) ("[S]ection 2617 provides no relief unless the plaintiff can prove that he was prejudiced by the violation.").

Carter has not provided any evidence that he was prejudiced as a result of the September 2008 payroll record (or that the record was even related to his FMLA leave). Carter does not genuinely dispute that he had 107.5 payable sick days before his FMLA leave and that he still had 107.5 payable sick days after his FMLA leave. DSOF ¶ 37. At most, Carter has provided evidence that he received an aberrant record six months after his return from FMLA leave that erroneously listed his payable sick day balance as zero. PR ¶¶ 26, 36-37. Absent any prejudice, Carter's FMLA interference claim for payable sick days fails.[7]

## B.    Retaliation

The FMLA also provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "In other words, the employer cannot use the employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013); *see also* 29 C.F.R. § 825.220(c). A plaintiff can prove retaliation directly or indirectly. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). The Court addresses each in turn.

---

[7] This is one example of the scattershot type of claim that Carter should have weeded out and abandoned long before summary judgment briefing. Continuing to pursue a claim for what was essentially a paperwork mistake that was corrected only obscures any other claims that may have merit.

### 1. Direct Method

Under the direct method of proof, a plaintiff "must demonstrate that [his] employer intended to punish [him] for requesting or taking FMLA leave." *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009). As its name implies, the "direct" method focuses on "whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (citation omitted). A plaintiff "must offer either direct evidence that would prove the fact in question—the discriminatory intent—without reliance on inference or presumption, or a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011) (citations omitted).

A plaintiff using the "convincing mosaic" approach may present three broad types of evidence: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) showing that the employer systematically treated other, similarly situated employees better; and/or (3) showing that the employer's justification for the adverse action is pretextual. *Id.* at 734. These categories are not exclusive. The ultimate question "is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity. To answer that question, the individual 'bits and pieces' presented by the

plaintiff must be put into context and considered as a whole." *Hobgood v. Ill. Gaming Bd.*, 2013 WL 3599498, at *7-8 (7th Cir. July 16, 2013).

The primary action that Carter attempts to link to his exercise of FMLA rights using the direct method is CSU's failure to appoint him Chair of the Department, both in April-May 2008 (when the position went to Coupet) and again in November 2008 (when the position went to Hunt after Coupet resigned).

With respect to the April-May 2008 appointment process, Carter cites various circumstantial evidence to support his claim, including that: (i) the process occurred shortly after he returned from leave; (ii) Simyar made a statement that may have reflected some animus towards Carter and his frequent complaints;[8] (iii) Simyar went to significant lengths to support Coupet over Carter, even after Coupet withdrew from consideration; and (iv) the primary reason given by Simyar for not supporting Carter—that Carter did not have a Ph.D.—is a pretext. CSU responds that timing alone is not enough, that Carter improperly relies on older facts from his prior lawsuit concerning 2006-07 conduct, and that Simyar simply recommended Coupet because he thought Coupet would better lead the Department and had the educational requirements—a Ph.D.—required for the position.

These issues are ultimately fact intensive and must be resolved by a jury. Take pretext for example. The exact nature of the policy requiring that department

---

[8] Simyar testified that Carter's salary was never actually reduced after he failed to teach an assigned class in 2007 because "if it would have happened, Professor Carter would write me letters and file grievance[s] and complaints and so on." PSOF ¶ 5.

chairs have Ph.D.'s is not clear. CSU has no written guidelines,[9] and different witnesses have given different accounts of the policy. When Simyar recommended Coupet, he explained that "[i]n choosing Dr. Coupet, I avoided the process of recommending Prof. Carter for Chair to President Daniel, as I am already aware of *university policy of requiring Ph.D.['s]* for regular chair appointment." Jefferson Dep. Ex. 7 at 1207-08 (emphasis added). But Debrah Jefferson, Associate Vice President of Academic Affairs and Contract Administration, suggested that the policy may not be as rigid as Simyar portrayed it: "in 2008, *then-CSU President Elnora Daniels strongly encouraged* the appointment of individuals with terminal degrees as Department Chairs." Jefferson Aff. ¶ 20 (emphasis added). Jefferson's account of the policy—which CSU adopts in its briefs—itself suggests that Simyar may have had more discretion than he let on in May 2008.

It also appears that CSU may not have strictly followed whatever policy did exist. Notably, in the very same year that Simyar supported Coupet over Carter, Simyar recommended and Daniels appointed Bokhari as Chair of the MMIS Department—the other half of the College of Business—even though he did not have a Ph.D. from an accredited institution. PSOF ¶ 26; DR ¶ 26. Moreover, several interim chairs of the Department did not have Ph.D.'s, nor did at least three permanent chairs of other departments. DSOF ¶ 53; PSOF ¶¶ 18, 30.

---

[9] In contrast, CSU does have a written policy spelling out degree requirements for receiving tenure. Jefferson Dep. Ex. 9. Although many departments require a Ph.D., the Department does not. An MBA plus being a CPA is enough. *Id.* at 1214.

Every time Carter points to one of these counterexamples, CSU offers various reasons why the Ph.D. policy did not apply in a particular case—*e.g.*, confusion over accreditation, interim positions, appointments before or after Daniels' tenure as President, or some departments caring less about Ph.D.'s. A jury could ultimately believe all of these explanations. But the Ph.D. policy is vague enough, and the exceptions are numerous enough, that a jury could also reasonably question what the policy actually was, whether it really hindered Carter's appointment, and whether Simyar's reliance on the policy was the true reason for his actions.

The timing of events is another example of an issue laden with factual disputes. CSU argues that the passage of two months (apparently between Carter's return from FMLA leave and Coupet's appointment) is not inherently suspicious, but the timing is actually much closer than that. Carter's exercise of FMLA rights did not end when he returned from leave on March 21, 2008. Over the next month, Carter strenuously objected to the original scope of the outline assignment. As late as April 25, 2008, Carter continued to openly accuse CSU of violating his FMLA rights. Jefferson Dep. Ex. 5. Carter's exercise of FMLA rights directly overlapped with the chair appointment process—the initial faculty vote occurred on April 21, 2008, Carter Dep. Ex. 12, and Simyar ultimately recommended Coupet over Carter on May 7, 2008. Carter Dep. Ex. 13. Given this close timing, a jury could reasonably question whether some animus related to Carter's complaints about the outlines may have carried over into the chair appointment process.

CSU argues that any animus by Simyar cannot support Carter's claim because Daniels, not Simyar, was the ultimate decisionmaker. To prevail on his retaliation claim, Carter must provide evidence "that the *decisionmaker* has acted for a prohibited reason," *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011) (emphasis in original), or that "a supervisor perform[ed] an act motivated by [a prohibited] animus that is *intended* by the supervisor to cause an adverse employment action" and the "act [was] a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (emphasis in original). The latter approach has become known as the "cat's paw" theory. *Schandelmeier-Bartels*, 634 F.3d at 379. For Carter to prevail under the cat's paw theory, he must demonstrate that: (1) Simyar acted upon an improper animus with the intention of causing Daniels not to appoint Carter; and (2) Simyar was a proximate cause of Daniel's decision not to appoint Carter.[10]

---

[10] CSU claims, quoting *Staub*, 131 S. Ct. at 1189, that the cat's paw theory requires Carter to establish that Simyar exercised "singular influence" over Daniels and that Daniels' decision was the product of "blind reliance." R. 110 at 7. *See also* R. 89 at 8 & n.9 (citing pre-*Staub* case law). Disappointingly, CSU completely misstates *Staub*. In the portion of *Staub* quoted by CSU, the Supreme Court was explaining the *Seventh Circuit's* earlier opinion in the case. The Supreme Court then *reversed* the Seventh Circuit and adopted a different rule: "We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Staub*, 131 S. Ct. at 1192-93 (emphasis in original). *See also Lee v. Waukegan Hosp. Corp.*, 2011 WL 6028778, at *4 (N.D. Ill. Dec. 5, 2011) (explaining that "[i]n holding as it did, *Staub* expressly rejected the more constricted approach of Seventh Circuit cases (such as *Staub* itself)" that required "singular influence" and "blind reliance").

As discussed above, a jury could reasonably infer that Simyar's actions were motivated by retaliatory animus. A jury could also reasonably infer that Simyar intended to cause Daniels to appoint Coupet and that Simyar's actions were a proximate cause of Daniels' decision. That is the entire point of the Dean's role in the chair appointment process. For example, Jefferson testified that a Dean's recommendation carries weight because a chair is part of the Dean's staff and that "[g]enerally, [the President] accepts the Dean's recommendation." Jefferson Dep. at 53-54. Indeed, Daniels followed Simyar's recommendation to appoint Coupet even though the Provost had expressed concerns (that turned out to be well-founded) about Coupet's commitment to the position. PSOF ¶¶ 25, 28.

In sum, Carter has presented sufficient evidence to create a genuine issue of material fact as to whether CSU retaliated against him in the April-May 2008 chair appointment process. Of course, that is not to say that Carter will prevail at trial. CSU certainly would have had a variety of legitimate reasons for not giving the position to Carter. In 1995-96, for example, Carter served as Chair for a short time before CSU's President terminated his service citing "overall ineffective leadership evidenced by extreme divisiveness within the department," "faculty perceptions of inequitable standards," and "lack of communication . . . to such a degree that some faculty members refuse to even talk to the chair anymore." Carter Dep. Ex. 1. Simyar also expressed concerns about Carter's ability to lead the Department. Carter Dep. Ex. 13. Ultimately, a jury will decide whether CSU's appointment of

Coupet was retaliation for Carter's exercise of FMLA rights (or other protected activity), or was for proper, non-retaliatory reasons.

Carter's retaliation claim for the November 2008 appointment process does not fare as well. To maintain a claim for failure to promote, a plaintiff "must first show that [he] properly applied for the position." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010). Carter does not even attempt to do so.[11] Carter argues in general terms that Simyar should have appointed him instead of Hunt, but Carter never suggests that he expressed any interest in the acting Chair position at that time. As a result, CSU is entitled to summary judgment on Carter's claim involving the November 2008 appointment process for department chair.

Almost in passing, Carter also attempts to use the direct method of proof to link his exercise of FMLA rights to the summer course assignments from 2008-11. But CSU assigned courses for the summer of 2008 before Carter took his FMLA leave.[12] The assignment process for the remaining summers began in September 2008 (for the summer of 2009), September 2009 (for the summer of 2010), and September 2010 (for the summer of 2011). That is generally far too long—from five to 29 months—after Carter's exercise of FMLA rights to infer causation. *See, e.g., O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011); *Filipovic v. K &*

---

[11] This is another claim that would have best been left on the cutting-room floor.

[12] Carter does not contend that there is any connection between his January 22, 2008 request for FMLA leave and the course assignments announced the next day, on January 23, 2008. The assignment process began the September before, and Carter has not offered any evidence that there were any last-minute changes in the assignments after he requested his FMLA leave.

*R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). Although timing is only one factor, this is not a case where a plaintiff might still prove retaliation after such a lengthy period of time. As discussed in more detail below, Carter has not provided any other evidence suggesting that the summer course assignments had anything to do with his exercise of FMLA rights (or other protected activity).

### 2.    Indirect Method

The indirect method of proof has three steps. First, a plaintiff must establish a *prima facie* case of retaliation, which requires evidence that: (1) he engaged in protected conduct; (2) his job performance met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Second, if a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Third, if the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

As part of his *prima facie* case, a plaintiff has the "burden . . . to establish the similarity between himself and the proposed comparable employees." *Peters v. Rennaisance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002). A similarly situated employee need not be "identical," *Caskey v. Colgate-Palmolive Co.*, 535 F.3d

585, 592 (7th Cir. 2008), but he must be "directly comparable to the plaintiff in all material respects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). This analysis is "flexible, and the result depends on any relevant factors and common sense." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 538 (7th Cir. 2013). There must be "enough common features between the individuals to allow a meaningful comparison. . . . [T]he purpose of the similarly situated requirement is to eliminate confounding variables . . ., which helps isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) (citations omitted).

In evaluating pretext claims, courts are not "'superpersonnel department[s]' where disappointed . . . employees can have the merits of an employer's decision replayed to determine the best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citations omitted); *see also Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010). "Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000). A plaintiff therefore must present evidence that "the employer's proffered reasons are factually baseless, were not the actual motivation for the [action] in question, or were insufficient to motivate the [action]." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996). A plaintiff's "own subjective belief[s] cannot substitute for evidence." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 847 (7th Cir. 2007); *see also Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008).

### a.     Chair Appointments

Carter's claim involving the April-May 2008 appointment process survives summary judgment under the indirect method as well. As with the direct method, Carter has sufficient evidence to create a genuine issue of material fact as to whether CSU's proffered reason for appointing Coupet—that Carter did not have a Ph.D.—is pretextual. Carter also has sufficient evidence to create a genuine issue of material fact as to whether other faculty without Ph.D.'s were similarly situated and treated more favorably. Those other faculty members include (i) Bokari, who was appointed Chair of the MMIS Department even though he did not have a Ph.D. from an accredited institution, (ii) Roper and Hunt, who each served as acting Chairs of the Department even though neither has a Ph.D., and (iii) the permanent Chairs of the Art and Design, Occupational Therapy, and Music Departments, none of whom had Ph.D.'s. If a jury ultimately believes CSU's account of the Ph.D. policy and its many exceptions, then these other faculty members may not be similarly situated to Carter after all. But as discussed above, the Ph.D. policy is laden with factual disputes that cannot be resolved on summary judgment.

Carter's claim involving the November 2008 appointment process fares no better under the indirect method. Carter's failure to offer evidence that he applied for the position is fatal here as well. And even if that failure was not dispositive, Carter would still have to provide evidence that CSU's stated reason for not appointing him acting Chair—that he never expressed any interest in the position—

is pretextual. Carter does not even attempt to do so, as it would be difficult to complain about not being appointed to a position he did not pursue.

### b.    Master Course Outlines

Carter also attempts to use the master course outline assignment to support an FMLA retaliation claim. Carter's claim fails for at least two reasons. First, as discussed above, CSU restored Carter to the same or equivalent position upon his return from FMLA leave by having him prepare outlines for the four courses he was teaching that semester and would teach in the future. An employer obviously cannot "retaliate" against an employee for exercising FMLA rights by providing the employee the very rights to which he is entitled under the FMLA.

Second, Carter has not identified any similarly situated professors who did not assert FMLA rights and were treated more favorably. Carter notes that Roper was allowed to continue teaching one of her courses after returning from non-FMLA leave. PSOF ¶ 14. But Roper missed only 13 days, not more than seven weeks like Carter. Mays Aff. ¶ 13. Even then, two of her three courses were still reassigned to another professor. Tolia Dep. Ex. 1; Carter Dep. at 161-62. Carter has not carried his burden of establishing that Roper was similarly situated.

### c.    Summer 2008

Carter claims that CSU retaliated against him by assigning him one course instead of two during the summer of 2008. CSU argues that Carter cannot prevail because it assigned the courses before Carter's FMLA leave. In his response, Carter

contends that the retaliation actually occurred in April 2008 when CSU added an extra class for another professor, Bryant, but not for him.

Carter fails to establish that Bryant was similarly situated. First, the course that CSU added for Bryant was her only course that summer. DSOF ¶¶ 31-32; PR ¶ 31. She was not assigned two courses, as Carter claims he should have received. Second, CSU added Bryant's course in response to unique circumstances. Bryant usually supervised summer internships, CSU inadvertently left that "course" off the initial schedule for the summer of 2008, and students were asking how to get internship credit. Jefferson Dep. at 83-84. Carter does not provide any evidence that there was similar un-met student demand for any of his courses.

Carter also has not provided even a scintilla of evidence to suggest that CSU's proffered reason for adding a course for Bryant but not Carter in April 2008 is pretextual. Carter offers nothing more than his own subjective belief that CSU should have added a course for him as well and that its failure to do so was somehow in retaliation for his exercise of FMLA rights. CSU offers summer courses to fit the needs of its students, not its professors. The FMLA did not impose a duty on CSU to create a second course to accommodate Carter simply because it added a new course for Bryant in response to student demand.[13]

---

[13] CSU also argues, without citing any authority, that Carter's gripes about summer courses do not involve a materially "adverse employment action" because he was not guaranteed the right to teach summer courses. The Court disagrees. Most employment decisions are discretionary. That obviously does not permit an employer to consider impermissible factors in making those decisions. Carter is paid for teaching summer courses, and as a result, a wrongful denial of that opportunity (which did not happen here) could constitute an adverse employment action.

### d.　　Summer 2009

Carter claims that CSU retaliated against him by not assigning him any courses for the summer of 2009. CSU asserts that it did not assign Carter any courses because he was late in submitting his request. Carter submitted his request on September 22, 2008, a week after the university-wide deadline.

Carter argues that professors sometimes teach summer courses without submitting a timely request. PR ¶ 12. As support, Carter cites only Tolia's deposition testimony that the Chair might consider a late request "depend[ing] on whether there was a competition for the courses in that area. If nobody wants to teach a course, we beg them even if they don't ever apply." Tolia Dep. at 52. But there is a notable difference between (i) begging professors to teach a course that no one wants to teach and (ii) assigning a course that was requested by multiple professors, some on time and some after the deadline.

Carter has not identified a single example of the Department (or CSU) assigning an in-demand summer course to a professor notwithstanding a late request. Indeed, Bryant submitted her request for the summer of 2009 two days late, and CSU did not assign her any courses either. DSOF ¶ 60. This also was not the first time Carter did not receive a summer assignment after he missed the deadline to submit requests—the same thing happened in 2006, long before Carter's FMLA leave (or other protected activity). *Carter I*, 2011 WL 3796886, at *9.

As a result, Carter's retaliation claim fails because (i) he cannot show that he was meeting CSU's legitimate expectations by submitting his request after the

deadline, *id.*, (ii) he has not shown that any similarly situated professor who did not assert FMLA rights was treated more favorably, and (iii) he has not provided any evidence that CSU's proffered reason is pretextual. *Id.*

### e.     Summer 2010

Carter claims that CSU retaliated against him by reassigning one of his two courses for the summer of 2010 to Roper. CSU asserts that it reassigned a Cost Accounting course from Carter to Roper after it realized that it mistakenly failed to assign Roper any summer courses. Carter does not dispute that CSU initially made a mistake, but contends that to correct the mistake, CSU should have created a new course for Roper or taken a class from a different professor.

Carter's claim fails because has not identified any similarly situated professor who did not engage in protected activity and was treated more favorably. The only other professors who were initially assigned two courses that summer were Hunt and Choi. They each taught the same classes that they taught every summer from 2008-11—Legal Environment and Federal Income Tax (Hunt) and Personal Financial Decisions and Principles of Finance (Choi). DSOF ¶ 65. Carter has not provided any evidence that Roper requested or was even qualified to teach those courses. As a result, Carter has not shown that taking a course from Hunt or Choi instead of him was even a viable option. Without that, Carter cannot establish that Hunt or Choi were similarly situated professors.

Carter also has not provided even a scintilla of evidence to suggest that CSU's proffered reason for taking his second course is pretextual. Again, Carter

offers nothing more than his own subjective belief that CSU should have added a new class for Roper or taken one from someone else. But Carter has not provided any evidence that there was sufficient demand to create a new course or that taking a course from someone else was even an option. Indeed, if CSU could not take a course from Hunt or Choi because they were uniquely qualified to teach those courses, the only other option besides taking Carter's second course would have been taking another professor's *only* course and giving it to Roper.

### f.      Summer 2011

Carter claims that CSU retaliated against him by assigning him one course instead of two during the summer of 2011. Four professors were assigned two courses that summer—Hunt, Choi, Roper, and Arrendondo. Here, Carter only proposes Roper and Arrendondo as similarly situated professors.

The Court disagrees that Roper or Arrendondo were similarly situated. For the summer of 2011, Carter asked to teach Intro to Financial Accounting and Intro to Managerial Accounting. Carter Dep. Ex. 18. Roper and Arrendondo were not Carter's competition for those courses: Roper was assigned Cost Accounting and Intermediate Accounting I, and Arrendondo was assigned Intermediate Accounting II and Advanced Accounting. PSOF ¶ 36. Carter was ultimately assigned Intro to Managerial Accounting, while the Intro to Financial Accounting class went to Grange, her only course that summer. DSOF ¶ 68.

Carter's suggestion that Roper and Arrendondo were similarly situated also suffers from other flaws. Although Carter claims that he was higher on the rotation

list than Roper, PSOF ¶ 36, Carter has not provided any evidence of that besides his own speculation that he was higher because one of his courses was reassigned to her the summer before (resulting in each having one course). Carter Dep. at 179-80. And although there is no dispute that Carter was higher on the rotation list than Arrendondo, PSOF ¶ 36, DR ¶ 36, when a second course was assigned to Arrendondo, Carter was already teaching his Intro to Managerial Accounting course during the same time slot. Jefferson Dep. at 101.

Even if Roper or Arrendondo were similarly situated, Carter also has not presented sufficient evidence of pretext. CSU asserts that Roper and Arrendondo received their assignments based on the variety of factors that properly go into the course assignment process, and Carter has not provided any evidence that CSU's proffered reasons are factually baseless, not the actual motivation for its actions, or were insufficient to motivate its actions. Once again, Carter offers nothing more than his own subjective beliefs that he should have been assigned two courses ahead of Roper or Arrendondo. Carter's subjective beliefs apparently do not take into account all of the minutiae that actually goes into the course assignment process, including the needs of the Department and its students, which courses different professors actually request, and scheduling issues.

## II.    Section 1981

Section 1981 protects the right of all persons "to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a); *see also Smith v. Bray*, 681 F.3d 888, 895 (7th Cir. 2012). Section 1981 authorizes retaliation claims if a person takes action

against another for asserting the right to contractual equality. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). Individual employees can be held liable under Section 1981 if they "participated" in the retaliation. *Bray*, 681 F.3d at 896-97 & n.2. Section 1981 retaliation claims are analyzed the same way as FMLA or Title VII claims—using the familiar direct and indirect methods of proof. *Id.* at 896; *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009).

Carter alleges that Simyar and Tolia retaliated against him for asserting his rights under Section 1981. In particular, Carter filed a prior lawsuit against Simyar and Tolia in 2007 alleging racial discrimination and retaliation during the summers of 2006 and 2007 and the 2006-07 school year. Carter also filed various EEOC charges from 2007 through 2011 concerning the alleged discrimination and retaliation at issue in this case and in Carter's prior lawsuit.

Carter's Section 1981 retaliation claims fare the same as his FMLA retaliation claims. Carter has presented sufficient evidence to survive summary judgment on his Section 1981 retaliation claims involving the April-May 2008 appointment process for department chair. Under the direct method of proof, the "convincing mosaic" of circumstantial evidence is largely the same, including Carter's evidence of animus and pretext. The only difference is that the alleged motivating factor for the retaliation is not Carter's exercise of FMLA rights, but his filing of a lawsuit against Simyar and Tolia. Carter named Simyar and Tolia as defendants in that lawsuit in November 2007, and the appointment process occurred five or six months later. Although a delay of five or six months is generally

too long to infer causation, a jury could reasonably conclude based on the totality of the evidence, including that the lawsuit was still pending, that there was a causal link between the lawsuit and the strenuous opposition to Carter's candidacy. Under the indirect method of proof, again, Carter has sufficient evidence to create a genuine issue of fact as to whether the Ph.D. policy is pretextual and other faculty without Ph.D.'s were similarly situated and treated more favorably.

There is also little doubt that Simyar participated in the alleged retaliation. After the faculty vote ended in a 4-4 tie and Coupet withdrew from consideration, Simyar talked Coupet into re-entering the race and then recommended Coupet to Daniels. Daniels followed Simyar's recommendation, even though the Provost had expressed some concerns about Coupet's commitment.

Tolia is a closer call, but Carter has sufficient evidence to at least create a genuine issue of material fact. As Carter notes, Tolia testified that although he does not recall the specifics, he is "sure" he talked to Simyar about how to handle the appointment after Coupet withdrew following the faculty vote and "might have" talked to Coupet about re-entering the race. Tolia Dep. at 32-33. Although Tolia's testimony is far from conclusive, on summary judgment, the Court must draw all reasonable inferences in the light most favorable to Carter. A jury could reasonably infer from Tolia's testimony that he played a role in Coupet's appointment.

Carter's remaining Section 1981 retaliation claims fail for the same reasons as his FMLA claims. Carter cannot prevail on his claim related to the November 2008 appointment process because he has not presented evidence that he expressed

interest in the position. Carter cannot prevail on his claims related to summer course assignments because he has failed to provide sufficient evidence (i) to directly infer intentional retaliation or (ii) to suggest that similarly situated professors who did not engage in protected activity were treated more favorably or that the proffered reasons for the assignments are pretextual. Carter cannot prevail on his claim related to the outlines because the assignment complied with the FMLA and he has not presented evidence that similarly situated professors who did not engage in protected activity were treated more favorably.

### III.  Title VII

Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for an employer "to discriminate . . . because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." *Id.* § 2000e-3(a). As with the FMLA and Section 1981, a plaintiff can establish a Title VII retaliation or discrimination claim through either the direct or indirect method of proof. *Bray*, 681 F.3d at 896; *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004).

As with his Section 1981 retaliation claim, Carter alleges that CSU violated Title VII by retaliating against him for filing *Carter I* and various EEOC charges.

Carter's Title VII retaliation claim is evaluated under the same rubric as his Section 1981 retaliation claim and does not need to be separately addressed. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Williams v. Waste Mgt. of Illinois, Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004). The Court's rulings on Carter's Title VII retaliation claims are the same as on Carter's Section 1981 (and FMLA) retaliation claims—the claims involving the April-May 2008 appointment process for department chair survive summary judgment; the rest do not.

Carter also alleges that CSU discriminated based on his race (African American) and gender (male) in its summer course assignments from 2008-11. He attempts to establish discrimination through the indirect method. Carter's claim is frivolous. He cannot demonstrate that similarly situated non-African-American or female professors were treated more favorably (let alone that CSU's proffered reasons for summer assignments are pretextual). There is not the slightest hint that race or gender played any role in summer course assignments.

Between 2008-11, seven out of the nine Department professors who taught summer courses were African American. African-American professors routinely received two courses in a summer—Hunt (four times), Roper (twice), and Grange (once). DSOF ¶¶ 31, 61, 65, 68. The only other professor who was consistently assigned two courses was Choi (Asian), but he taught the same finance classes every summer that Carter never requested and is not qualified to teach. Jefferson Aff. ¶ 10; DSOF ¶ 66; PR ¶ 66. Arrendondo (Hispanic) was also once assigned two courses, DSOF ¶¶ 68-69, PR ¶¶ 68-69, but Carter did not ask to teach those courses.

Carter Dep. Ex. 18. Carter has not identified a single example of a similarly situated non-African-American professor who was treated more favorably.

Carter's gender discrimination claim is also defective. Between 2008-11, six out of the nine Department professors who taught summer courses were male. Male professors routinely received two courses in a summer—Hunt (four times), Choi (four times), and Arrendondo (once). DSOF ¶¶ 31, 61, 65, 68. Carter argues that he was treated differently from Bryant in 2008, but as discussed above, CSU added a course for Bryant later in the process because the course was mistakenly left off the schedule and students were requesting it. Jefferson Dep. at 83-84. Carter also argues that he was treated differently from Roper in 2009-11. But in 2009, Carter was not assigned any courses because he did not submit a timely request. Bryant also submitted her request after the deadline that year and was not assigned any courses. DSOF ¶ 60. In 2010, CSU reassigned one of Carter's summer courses to Roper because Carter had two and Roper erroneously did not have any. *Id.* ¶ 63. And in 2011, Roper was assigned two classes, neither of which Carter requested. *Id.* ¶ 68; Carter Dep. Ex. 18. Again, Carter has not identified a single example of a similarly situated female professor who was treated more favorably.

## IV.  Americans With Disabilities Act

The ADA protects employees from retaliation for asserting an ADA claim. 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual . . . because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."); *see also Cloe v. City of*

*Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013). In *Carter I*, Carter asserted an ADA claim alleging that CSU failed to accommodate his sleep apnea. Although the court in *Carter I* rejected that claim, 2011 WL 3796886, at *5-6, Carter now alleges that CSU retaliated against him for asserting the claim.

The parties treat Carter's ADA retaliation claim the same as his Title VII retaliation claim. The Court agrees that similar treatment is appropriate—both claims essentially hinge on whether CSU retaliated against Carter for filing his 2007 lawsuit (which included claims under the ADA, Title VII, and Section 1981). The Court's ruling is the same for Carter's ADA retaliation claim. As discussed above, Carter's claim for the April-May 2008 appointment process for department chair survives summary judgment; Carter's other retaliation claims do not.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, R. 88, is granted in part and denied in part.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: August 1, 2013